May it please the Court, Counsel. My name is Anita Woodenberg, an attorney with the Bopp Law Firm, and counsel for Randolph Wolfson, who is a plaintiff appellant in this case. If I may, I'd like to reserve three minutes of my time for rebuttal. State judicial elections are designed to hold judges accountable to the people. As the Supreme Court observed in Republican Party of Minnesota v. White, quote, state court judges possess the power to make common law, and they have the immense power to shape the state's constitutions as well, which is precisely why the election of state judges became popular, end quote. Knowing that they are being scrutinized by the electorate, judges are keenly aware of the electorate's interest that the law be applied impartially and reasonably, and of its power to remove them if it is not. Regulations like the judicial canons at issue here, Arizona's endorsement clause, its solicitation clauses, and its campaigning prohibition, interfere with that accountability. While these canons purport to promote impartiality by asking whether your arguments go to sitting judges who are candidates or to sitting judges who are not candidates. The issue here is the issue here is. I know what the issue here is, but I want to know as you talk about whatever you talk about why there would be any line or difference, would there be any difference between judicial candidates who are not at the time judges and judicial candidates who are at the time judges and judges who are not at the time judicial candidates at the era. It seems to me that you're that as I've been reading your arguments, although they purport to go only to judicial candidates who are not judges, the actual arguments would appear to go to sitting judges who are or are not candidates. I would argue our arguments go to our go to all judicial speech, whether it's a judicial candidate or a judge. So in other words, it would go to, does it matter whether or not the judges are elected? I understand that your judges are elected, but what about Article III judges? Wouldn't the same arguments apply the way you're making them? Yes, I would say that they, that the same arguments. So in the end, what we have to agree with is that, for example, sitting judges who are not elected can endorse candidates for Congress? I would say yes, because, you know, they are, they are elected, they are elected officials, they do have some of the rights. I'm saying what if they're not elected officials? I understand yours are elected officials. What if they're not elected officials? Why does that matter? I'm sorry. Why does it matter that they're elected officials? Because of the arguments you're making. The arguments are essentially, this is political speech, and people, and it should be subject to strict scrutiny. Correct. And that the consideration of impartiality of judicial independence is not a sufficient reason. So it would seem to go to non-elected judges. I think that the arguments are applicable to non-elected judges, but I think certainly where you are in a circumstance where you do have elected officials, where the electorate is involved through the election process in ensuring the impartiality of their courts, the First Amendment has the most urgent application because the political speech at issue relates to, is in an election context. But that isn't the case with regard to Judge Berzon's question, because Federal judges are not standing for re-election. So if your position is that the First Amendment trumps no matter what, then presumably Federal judges would be free to endorse candidates for President and Senators who recommend our replacements, and basically we could endorse people for public office? Well, and our position is not that the First Amendment trumps no matter what, because if you look at the Supreme Court decision in White, they look at, on the one hand, the First Amendment interests of the judicial candidate in that context, although certainly we could say of a judge. But then on the other side, the due process concerns that are implicated, you know, creating bias for or against a party in a proceeding. Would you concede that that is a compelling interest of the State? In the abstract, yes. I would say that, yes. That it's important to have judges who are impartial and who appear to be impartial under the due process clause? Yes. And so as the only interest, in other words, impartial usually means, you know, not biased against a litigant. But is that the only interest, or is there an interest in essentially the institution as a nonpolitical institution having a credibility for that reason? When we're weighing First Amendment rights against what we're trying to define as a compelling interest, I think it really does need to be moored to due process. It does need to be attached to that. So a concern, an overarching general concern about the fairness or perceived fairness that isn't tied to a specific concern that a litigant will be deprived of due process, I think in that circumstance it would no longer be a compelling interest. That's a pretty weak interest, actually, in most of these instances, because, as you point out, you can substitute a recusal rule. Well, I think, I mean, certainly insofar as the impartiality, I don't think it's a weak interest. It's just a narrow interest. I mean, I think that due process, because we have competing constitutional rights here, we're talking about restricting. But let's take a – your arguments do essentially back off to a recusal alternative most of the time. Correct. Correct.  And you're not looking at any other set of considerations about the role of the judiciary and the courts in society. And you're essentially telling us, yes, you don't want – you don't recognize any other compelling interest other than impartiality. I don't, but I think that's because I've not seen the Supreme Court recognize any other interest other than that. When the majority in the White decision looked at what would be a compelling interest to justify what was before then the Announce Clause, they focused on the fact that due process is the underlying justification for any compelling interest for restricting the free speech on the other side of that equation. And so – But that was within the confines of a then-pending judicial election. And what's really bothering me about your arguments is they don't have – I understand that's the context, but it's not – they don't have that limitation. You're looking at arguments that seem to, as I said before, go to the judiciary in general and would apply in general to judges sitting on the bench. That is true. Now, the thing to remember here, too, though, that, you know, even if a judge not up for election may be appointed – Like us. Like you. Okay. We're to consider – Most state court judges are appointed first before they have to stand for election. Many are. Many are. And then they're up for retention in many states. But in the event where that type of judge were contemplating making an endorsement, they certainly are not restricted to recusing themselves only in the context of due process. What we're looking at is whether or not we can tell judicial candidates that they must not – that they cannot speak because of impartiality or, as you would suggest, perhaps there are other interests. And I would submit that there is only the one compelling interest that justifies mandating, silencing, whether it's a judge or a judicial candidate, from endorsing or personally soliciting in the cases of a – Okay. If I endorse a person who wants to run for Congress because it's unlikely that I'm going to have a congressman before me in a case? I would say yes.  the most related to white because it deals with the election itself to some degree. At least to the degree it deals with the election itself. There seems to be a gap between you and the state as to what it actually provides. Does it – you say it means you can't sign a letter and you can't speak to a large number of people, but you can't speak face-to-face with someone and ask for a solicitation. So which is it and should we take the state at their word or not? I can simply read to you what the canon is, which I'm sure you've seen in the briefing, but just as by way of reminder. The personal solicitation clauses say that a judicial candidate shall not, quote, solicit funds for or pay an assessment to a political organization or candidate, end quote. And secondly, a provision further down, a judicial candidate shall not, quote, personally solicit or accept campaign contributions other than through a campaign committee authorized under another rule, end quote. Has there been any interpretations by the – any commit – by the committee to limit that? Not that I'm aware of. But the question is what does personally mean. Does personally mean in person or person to person or does it mean something else? Well, the way this is crafted, it certainly does not lend itself to a – an interpretation that a personal solicitation is restricted to a one-on-one dialogue with a man. Do you think it matters? In your challenge, suppose it did say the only thing you can do is go for one-on-one with a – and ask for money. Suppose it said that in Huck-Verba. I don't think that it does matter. I mean, to me, the personal solicitation clauses are improper – are an improper remedy for any partiality concerns that the state might have. Because it's not really the ask that creates the potential for bias. It's actually the contribution. It's the money. It's actually receiving it. And in Arizona and certainly other states, you can know who contributes. So whether or not I ask or I have my best friend who I've appointed to my committee ask somebody for money, at the end of the day, I as the judicial candidate can know whether or not that person gave or did not. And, you know, so to me, it's just under-inclusive. I don't see that this rule, you know, whether – you know, whether it's restricted to large groups or the individual is really not a – is not really geared towards a one-on-one. And so I don't think that it's a rule that's restricted to during the campaign. Yes. Yes, so that – I mean, if the candidate has not – I would imagine, though, I don't know off the top of my head, that a candidate probably cannot begin to seek contributions until they've actually announced it to the candidate. And just going up to number 4, what does it mean to pay an assessment to a political organization? What is that? As best as I would understand it, certainly it's not the focus of what we're litigating here, but I would understand it to maybe be if a political organization had, like, a membership due. The only concern is with the solicit funds. Correct. Correct. Now, I mean, I suppose the sanctions, these are bar rules, right? That's what they are. Or are they judicial conduct rules? Judicial conduct rules. Correct. All right. But if a candidate runs and isn't elected, can he still be disciplined under these rules? I believe that he can if he wins. I just said if he doesn't win. Oh, I'm sorry. No, well, he can still be disciplined because I think that because of the code of professional conduct, subjects, you know, lawyers to the code of judicial conduct and thereby gives the power to enforce. So the ultimate sanction, I mean, no one's going to jail over this, right? The ultimate sanction here is a professional sanction. Yes. Whether – I mean, I don't know the extent that could – that would be imposed certainly could amount to as much as, you know, being disbarred. That might be extreme, but nonetheless. Has any lawyer ever been subjected to any kind of punishment for this, for violating these rules while running for a campaign? Not that I'm aware of. Of course, you know, with a rule like this, you know, speech would be chilled. People would avoid doing it. So the fact that there is no evidence that that has taken place certainly doesn't suggest that there isn't harm. But I'm not aware of any circumstance. Did you want to save some time for rebuttal? Yes, please, if I could. Okay. Thank you. May it please the Court, good morning. My name is Charles Grube. I'm Senior Agency Counsel to the Arizona Attorney General's Office. I'm here to represent the Commission, Member Defendants. With your permission, I'd like to reserve five minutes of our time so my colleague, Ms. DeMarchi, can present her comments on behalf of Barr Counsel, who's a separate defendant in this matter. I'd like to take my cue from the questions that the Court has already asked. There are really only two interesting things when you're trying to sort your way through a difficult and complex legal matter. And that, of course, is the standard to be applied and how that fits the facts. We're kind of imagining the facts in this case. So it's not too fruitful for us to spend too much time on that. That means the interesting question for us today is the standard. We took the position at the district court, and we take the position here, that this Court should adopt the reasoning of the Seventh Circuit, which took cases that have not previously been directly attached to the jurisprudence on limits on judges' political behavior. I understand that it has some resonance for me with regard to judges. But for judicial candidates, I'm having a problem. Thanks, Your Honor. And actually, that may just be the very best place for us to start. The district court said, well, the judicial candidates of today are the judges of tomorrow. So if you've got an interest for these rules in judges But you could have a judicial candidate who is a congressman. What's he supposed to do then? Once a judicial candidate, that judicial candidate is supposed to comply with these rules. Well, I understand that. But my point, I mean, I guess my rhetorical point is that until somebody crosses the line onto the bench, they are in their daily lives. I mean, all of us went through that, you know. And to say that somebody has to behave like they're a judge before they're a judge, I can understand it again with regard to those issues that pertain to the election itself. But with regard to matters that are not limited by the context of this election, I don't understand why there is the same interest in having a judicial candidate behave like a judge when he's not a judge, particularly in trying to import the Connick v. Meyer Garcetti line of cases. Well, I think that that's right, Your Honor. But let's draw that line a little more carefully. Mr. Wolfson today is not a judicial candidate. So Mr. Wolfson today is free to endorse candidates, engage in political speechifying, try to raise money for political candidates. He's free to do all these things. But why does it matter in terms of the State's interest, whether he's doing that the day before he declares his candidacy or the day after? I mean, in terms of the impartiality interests or anything else, it doesn't make any sense to me. If the day before he becomes a judicial candidate, he's raising money for Republican candidates, and then the people who are going to come before him as a judge are going to have the same problem as if he does it the day after. Well, not quite, Your Honor. We can't have rules of the Arizona Supreme Court restrict the activities of everybody in the whole world. We just can't. This Court wouldn't allow it. The First Amendment wouldn't allow it. I understand that, but it goes to the nature of the interest and also to this attempt to pull in the governmental official or governmental employee in light of cases. He's not a governmental employee until he becomes one. That's correct, Your Honor. But he becomes, or she becomes, a different person when taking formal steps to be elected. It is a different thing, then. You are no longer a member of the public. You are a person who has voluntarily sought to seek political office. You are a person who, if elected, will have the full awesome power of a judge in our system. Explain to me how the governmental interest applies to that. Well, first of all, what do you think the governmental interests are? I think the governmental interests break into two main categories here. And to use the Buckley v. Vallejo language, they are anti-corruption and to prevent the circumstance where objective and reasonable members of the public could be concerned that there was corruption and thus lose confidence. That's awfully narrow. I mean, isn't there an interest in essentially the perception and reality of a third branch that does not participate in the politics of the other branch, when you're talking about sitting judges? And isn't that essential to the credibility of courts? I mean, obviously, when States start having elected judges, they're kind of blurring the lines. But the question is, do they have to go eliminate it? Well, Your Honor, I view what you say. What you say is true. But what I view, that is, is an extension on the situation where members of the public could have, literally, a corruption concern, because that's what the underlying concern is. It isn't a generalized concern that somehow judges should be above the tacky business of politics. I personally have that sort of a concern. I suspect you do, too. But that one's very hard to articulate and very hard to apply. And it may sweep too broad. Yes, sir. But the Supreme Court in White seemed to suggest that we don't solve that anti-corruption concern by simply designating a judge's next friend as the bag man in soliciting the money. And why would that be any different whether the judicial candidate does it or has his best friend do it? Well, Your Honor, I think there's a very practical answer to that. And, you know, with your permission, and certainly meaning no slur against any judicial candidates, please consider the worst case of all, the classic thing that you always worry about in electioneering politics, that the behavior would happen behind closed doors. It would just, for instance, in a solicitation situation, be a one-on-one solicitation. All right. But that can happen. I mean, his best friend can go do the same thing. Well, Your Honor If he gives $500, he'll vote for you next. Your Honor, if his best friend does it, at least there are two people in on it. And, in fact, the campaign committees are usually bigger. At a minimum, the requirement of a campaign committee means that it can't just be two people. There have to be more. And you know what happens when more people have to be involved, particularly when, as in campaign committees, they have legal duties arising under the statutes? How do you read that provision by exception? And if there's a disagreement between the two of you as to what it means, what do we do about it? I'm sorry, Your Honor, I didn't hear you. Personally. I didn't hear you. Does it only apply to face-to-face solicitations or does it also apply to signing letters or speaking to large groups, which is what your opponents maintain? It does reach more broadly than one-on-one personal solicitations. Well, your brief certainly didn't say that, and it was a little baffling in that regard. You only address the person to person. Well, certainly, we talk about personal solicitations. Right. So if the candidate sends somebody a letter, that's a problem? Yes. If a judicial candidate in Arizona sends a letter, for instance, to the largest law firm in the county, and that says to that law firm, I'd really appreciate your support, that would violate the canon. And it has to. What if they just sent it to every household in Tempe? It would still – well, actually, in Maricopa County, we don't have the direct election of judges. Oh, well. But your point is the straightforward one. What is this, Mojave County? This is once Mojave County, Your Honor. And they elect their judges. They elect their judges, and it's a nonpopulous county. Wilson wants to send a flyer to every registered voter and every lawyer, whether he's registered or not, in order to solicit money. What's wrong with that? Well, what's wrong with it is it's a direct solicitation. It comes directly – It's a personal solicitation. It is a personal solicitation. And so what is the interest in precluding it in a world in which you are, in fact, electing judges, and judges have to be able to have some money, and it's kind of a fraud in the electorate practically if they don't sign the letter, because it's for them anyway. Well, no, Your Honor. See, there are two things there. The candidate's free to say anything to the electorate. Such as, I need some money. Well, he's not free to say, give me money. And you know what, Your Honor, when you get right down to it, saying to the electorate, I need money is like saying, I need oxygen. Everybody knows that one already. Or mother's milk. Yes, very much. There's a way to do it. And that points out the real distinction here. There's a speech element to this, of course. But the restriction – Of course, Your Grace said otherwise as to that, too. There are a lot of problems with this. Well, sure. There's a speech element. That plainly is wrong. There's all kinds of case law that says there's a First Amendment interest in solicitation. That's right. All right. But look at it this way, Your Honor. This is a restriction on a manner of fundraising. That's really all it is. Your point that you have to have your next friend do it or your best friend do it. Well, that might be true if you had this one-on-one limitation, but you don't. You're now telling me. But it is still a situation where every solicitation that a judicial candidate can do, the campaign committee can do, could do. The campaign committee can, in fact, legally do it. Why isn't recusal sufficient to avoid any concern about it? I think that's a very good point, Your Honor. And let me tell you why I think it's not sufficient. In the first place, it's not sufficient because it doesn't solve the problem of public confidence. When you have a circumstance where a judge personally solicits money and gets it and then has to repeatedly recuse her or himself, what you're really saying to the public was, you know, that anti-corruption thing you were worried about? You were right. So you've got the problem. Once you've got the problem. You have the problem, to be frank, because you're electing judges. That's why you have the problem. And judges can't run without money. Now, you could try to keep a secret from the judges who's giving them the money, but you don't do that. That's true. And so everything you're saying exists anyway. I'm sorry, Your Honor? So everything you're saying you're concerned about exists anyway. All he has to do is look at the piece of paper and see who gave him money. He could look or she could look. But there's another reason, and you're right, Your Honor, that judges can do that. And the policy isn't against, for instance, a judge who might want to look at the campaign list and try to decide who that judge likes and who that judge now really dislikes. That's what recusal's for. The business, however, of using a campaign committee and the restriction is to put somebody in the middle, in between. The other reason that we're seeing In a small county like Mojave, isn't the judge going to know virtually every lawyer who appears in the courtroom? Judges are very likely to know almost all the lawyers. And so isn't the judge going to know, under Arizona's public disclosure laws, whether or not that lawyer contributed money to his campaign? Sure, Judge. But that's still different from a circumstance where the candidate will send a letter directly to that lawyer, say, give me money, or look that lawyer right in the eye and say, give me money, and be turned down. But if the risk is one of anti-corruption or preserving impartiality, how does the existing address that problem if the judge knows full well who gave the money and who rebuffed the request? In the words of the Seventh Circuit, Your Honor, it reaches the situation of greatest harm, where a judge personally asks and is personally rebuffed. No, but it doesn't. You see, that's what you just told us isn't true. That's why I was asking. I gather in the Seventh Circuit situation it was a one-on-one restriction. No, I think it's broader than that. I'm not sure. But I thought it was. I want to go back to the recusal issue, because I'm interested in that as well. Does Arizona have an affidavit of prejudice that any lawyer can file against any judge? In the superior court level, Your Honor, a lawyer can have a judge removed really on motion, and one judge removal without specifying grounds for it. The judge doesn't have the discretion to say, I deny your recusal. That's correct. Now, that's a less useful situation in the small counties that we're actually concerned about, where the bar is small and, frankly, the list of judges is small. It's an operational problem. It is an operational problem and a very practical and expensive one. Let me ask you one thing. On this provision, I guess it's number 3, which says publicly endorse or oppose another candidate for any public office, suppose the candidate wanted to endorse another judicial candidate. How does that be prohibited under this rule? It would, Your Honor. What's corruption? Why is that why does that suggest there might be some corruption? If I wanted to endorse, if Judge Brezano and I were running for judicial office and I wanted to endorse her, or Judge Talmadge? It does because the endorsement in the first place in that circumstance doesn't really say anything of the core political speech that's currently most protected. Well, isn't there an interest in the listeners? I mean, there's another problem with the whole task of electing judges. And I see this when I vote for judges myself. I don't know who these people are. So unless I know, if I know what other judges who I do know think of them, then I might know something and I might be able to vote more intelligently. Why don't the listeners have an interest in knowing at least what other judges think of them? Well, certainly, Your Honor, in Arizona, in retention elections, we do use a process that evaluates sitting judges. Obviously, it doesn't work for judicial candidates. If I were voting for a judicial candidate in Berkeley and I knew that Judge So-and-So, who I really respect, knows this person who I don't know and says this person will make a great judge, that's the only way I'm going to even be able to begin to vote intelligently. Well, in the words of the Seventh Circuit, Your Honor, that turns a powerful sitting judge into a political power broker, a person who can sway public opinion. And that's a negative rather than a positive. That in general is a negative. Well, it may be a negative with regard to nonjudicial matters, but with regard to judicial matters, I'm not sure why it's a negative. It still has to be, Your Honor, if it's the election of a judge, because it's still a circumstance where the prestige of judicial office is used to further somebody else's electoral interest. I'm not sure there's a difference if you're a sitting judge in that scenario, but my question, my initial question was if it were both candidates, because this applies to candidates as well. It certainly does, Your Honor. And it has its most important So my question was if Judge Berzon and I are running for election together for different seats, why couldn't I endorse her? Well, look at it this way, Judge. I just failed to see what the Let's say that you were He'll have that anyway, helps guard against corruption. Well, let's say that you were a well-known person in the area and Judge Berzon, for whatever reason, were not. You were a person who had held judicial office before and were thus well-known and well-recognized, and so your endorsement for Judge Berzon would be most valuable. It raises the biggest problem, because then you would be using the power of previous judicial office, the power of your personality as a judicial candidate to bring another You're saying it's power. Another way of looking at it is just your the fact that you're a known quantity and people want to know what you think. But, Your Honor, when people want to know what you want to say, that activity is already protected. You're free as a judicial candidate to say anything. I'm talking about the other person, the person who is doing the endorsing. And the listeners. I mean, to me, that's the biggest issue, is the information available in these  to vote probably based, as much as anything else, on these cards that come in saying vote for so-and-so and so-and-so. If you don't have that, what are you voting on? Well, actually, Your Honor, as a practical matter, in the non-populous counties in Arizona, I think they get more information than that. But that's not the whole world. I mean, they're Sure. But it kind of is for me. And for this case Do they have a special rule for small counties? We do have a special rule for small counties, where the judges are directly elected. That's where the judicial candidate rules here come into play in Arizona. In populous counties, they don't. How many counties are affected by these rules? Let's see. I think currently there are three counties in Arizona that have the merit system selection because of their population. That means the remainder are roughly, what, I guess, 14, 13 or 14 counties. So your suggestion, we can write a rule that is restricted to small counties? No. My suggestion is we have a rule that has its You may have one, but we have to write an opinion that sets some parameters. And the question is, what are the parameters? I'm with you, Your Honor. And I am with you on that. The same rule applies to everybody. It applies to sitting judges. Judges apply it in a merit system. And if you can do it, if Arizona wanted to change its laws tomorrow and say that it applies in Maricopa County, too, presumably our opinion would apply to that as well, unless you tell me some way I can write an opinion that only applies to small counties. And, in fact, Your Honor, I'll tell you the contrary, that if there was a judge who was about to have a retention election in Maricopa County, the most populous county, and that judge did not receive a favorable rating in the state's rating system, that judge is allowed to campaign in the retention election. And these rules would apply to that judge as a political candidate. Let me ask you this. I have one other little hypothetical in it. Suppose I was a judicial candidate and I wanted to let the public know that, for example, in your county of Maricopa, that, you know, I like the policies of the sheriff. Would it be improper for me as a candidate to say I endorsed everything the sheriff is doing? Yes, it would, Your Honor. Why? It does because that would lead to the situation where a person could use, once again, the prestige of judicial office to actually be a candidate. Well, I'm just a candidate. Well, you're still using the prestige of your hopeful judicial office to yield support for another candidate. Well, let's suppose the sheriff is not up for election. He's just out there doing his thing. Well, in Arizona, I'm quite confident that if a judge wanted to come out and say, well, one of the big political topics of the day is the enforcement of the immigration laws, and boy, I think that our law enforcement officials are doing a great job. In particular, I like Sheriff Arpaio. Sheriff Arpaio. Okay. When you said what I said, there's no problem. When you say, I like Sheriff Joe Arpaio, well, if I were you in that circumstance, I would contact the Judicial Ethics Advisory Council first, before I said that, and ask whether that was a rule violation. You can see by the record in this case, by the way, that Mr. Wolfson was able to get those questions asked and answered in a very quick way. That's the safety valve on these rules, in case there's any doubt, is the Judicial Ethics Advisory Commission. I have one question. Has anybody ever been disciplined under these rules? People, sitting judges have been disciplined under these rules. I'm unaware of- These campaign rules that we're talking about? Rules that involved either offering their support to other candidates, or the business of electioneering activities. Now, I have to tell you, I have only second-hand knowledge on that, because until recently, those proceedings were confidential. And finally, and you're way, way over your time, and your colleague hasn't gotten to speak, but do you – I began by asking whether our opinion here necessarily applies to sitting judges and to sitting judges who aren't elected. What is your answer to that? Is there some way to carve this up? I don't think there's a way to carve this out between sitting judges. Frankly, to your other point, I don't think that the analysis is different for, for instance, federal judges. When the claimed interest is an interest of the institution versus the First Amendment interests of particular public officials, I think that analysis is the same for state court judges and federal judges, elected or not. Well, that may be, although the very fact that they're elected sort of changes the image of the states, the position in which they are placed by the state. It changes the position in which they're placed by the state, but it doesn't change the fact that people have First Amendment rights. Well, except that White distinctly said that speech in connection with electioneering is core First Amendment speech. But White also said that judicial elections don't have to look like executive branch or legislative elections. And just where you parse where those two concepts collide is, frankly, what this case is about. Okay. All right, well, we're going to hear from your colleague. Thank you very much. We'll give her a few minutes here. Thank you, Your Honor. I appreciate that. Good morning, please, the court. My name is Kim DeMarshi, and I represent the bar council in this case, Marette Fisela. She's the very end of the et al. I don't know if that's good or bad. Well, at the moment, she's the only one with disciplinary authority, because it is correct that a lawyer who is an unsuccessful judicial candidate can be sanctioned under the rules of professional conduct for violating the code of judicial conduct during their campaign. Has that ever happened? There's certainly no record evidence of it, and I'm not aware personally of any cases of it. Something else about the rules here, though, that's important to understand, and the place to find this is on page 144 of the plaintiff's excerpt of record. There is not an advisory opinion that gets into the details of what personal solicitation means. We took the position in the lower court that it means standing up in front of a group and asking for money and sending letters to a group of people and asking for money. Obviously, the one-on-one, shaking the hand, holding the hat out is the most corrupting, most concerning in terms of the appearance of impropriety interaction. But these canons say in their preamble that they are to be interpreted consistent with the Constitution. So if this Court were to find that restricting one-on-one interactions, but not sending letters to everyone who lives in Kingman were constitutional, the remedy is not to strike down the canon, but to require that pursuant to the code itself it be interpreted constitutionally and to explain what interpreting it constitutionally would look like. Alito, I mean, these regulations are very short and very broad. You're not suggesting that, are you? No, I'm not suggesting that at all. I'm suggesting that the remedy would look something like it can only constitutionally be interpreted to prohibit this conduct, vacate and remand to the district court for further proceedings, and give our clients the opportunity to say we're willing to interpret the canons in the way you've told us we're allowed to apply them. That's exactly what happened in the first case. Or rewrite them. We could rewrite them if we wanted. Well, and neither of the defendants actually write the canons. We're just the prosecutors. So we're sort of stuck with what the canons say. But the State could certainly choose to rewrite them. But the problem we have here is it's a facial challenge, and we don't – I mean, we have some affidavit declarations by Mr. Wolfson as to what he wants to do. But as you point out, there's very little in the advisory opinions that actually address all of the nuances of these regulations. So are we just going to speculate as to what we think a lawyer candidate would want to do in order to try and get elected to the office of judge? I would think the most prudent thing for the Court to do would be to go through the various kinds of things he says that he wants to do. And all that I'm suggesting is that if you have a different answer for face-to-face solicitations than you do for sending a letter, it would probably be useful to the parties and to the State to explain that you have a different answer, and then we'll worry about what that looks like in terms of this report judgment. Let me just change the subject a little bit. Certainly. How – I mean, I think that your reliance on the Connick-Garcetti line of cases is interesting, and I gather the Seventh Circuit did the same. But how does that apply to judicial candidates? I was really particularly struck by something that plaintiff's counsel said during her remarks, that it isn't the ask for money that's the problem, it's the money. And our view is really quite different. Well, let's leave the money part out of it, because the money – I mean, the solicitation provision deals with the campaign itself, so that's different. But on the other prohibitions having to do with endorsements and speaking on public – as I understand it, if there are initiatives and so on, why – it seems to me that the interest with regard to candidates is a lot weaker, and in particular, it's not the interest essentially in setting the parameters of the governmental role, because they're not in the role. And the reason that restricting – and I should point out, very narrow candidate – very narrow categories of candidate speech. Candidates can talk about their views on immigration enforcement, their views on law enforcement, their views on a whole range of public issues. What they can't do is try to position themselves as power brokers with regard to other campaigns. They have to limit their activities. I gather if there's an initiative on something, they can't speak about that either. They can speak about their views on it, but they can't actively campaign for it. They can't say, vote – I urge you to vote for Proposition 101. There's an advisory opinion, and the advisory opinion is, can you appear in a TV spot in favor of the initiative? And the answer there was no. But can you talk about your views on public policy and whether you support them? Yes. And so how do you explain that when the day before they declare for the judicial candidacy, they can do it? Because the day that they express their intent to seek a position whose fundamental role is fairness, the state of Arizona asks them to behave as though they are a person who will be fair when they get that job. Because some of them are going to get that job, right? Some candidates will succeed, and it might not be the incumbent, so we probably needed them to behave in an appropriate judicial manner. And even the ones who didn't succeed – and this is where I get to, it's the ask that's important. Recusal is essential, and no one is suggesting we should get rid of a recusal rule. But the recusal rule only applies to actual cases. And most ordinary citizens, fortunately, will never have anything to do with the court system. They'll never interact directly. They won't be a party asking to recuse. What they're going to see is campaign conduct by people who say they want to take on a role as the arbiter of fairness for the community. And the idea is that if those people behave as though they're not going to be fair, as though they're really just in it to be a political power broker, that that does fundamental damage to the perception of the neutrality of the justice system. I mean, I keep getting stuck on the fact that you're having an election. Once you're having an election, people are going to behave like they're electioneering. And that's why Arizona permits so much speech. There are just a few things you can't say. And as the Seventh Circuit pointed out, though numerous other courts have done it, directing your restriction at the most dangerous speech is actually the best way to balance the interest in the continuing functioning of government with the First Amendment rights. And that's really what Arizona's tried to do by not restricting announcement of your political views. Honestly, I think under these canons, you could say. So if Judges Berzon and Paez want to exchange endorsements in their run for a re-election, that's dangerous speech under these regulations? I suspect that Judges Berzon and Paez could hold joint fundraising events and appear together and maybe even split the cost of mailings. Wait a minute. You just said we can't have fundraising events. Oh, no, no, no. You can have fundraising events. I can have a fundraising event, but I can't ask for money. Not personally, no. You mean I can have a fundraising event in which people pay? Unless the Court decides that personal solicitations are okay. And people – your proxies have fundraising events.  I would rather have the – and keep in mind, my client does not interpret these rules. That's the kind of situation that I would suggest that a candidate take to get an advisory opinion on. You can get those in, you know, a couple of weeks.    I don't know. I don't know. I don't know. It's the Judicial Ethics Advisory Committee Commission. But ultimately, it's not your client who applies the discipline if there's discipline? My client applies the discipline, but the agency that issues advisory opinions is a different agency. I suspect that if there were a truly complicated case in front of my client, they would ask the Judicial Ethics Advisory Commission to help them understand what the discipline is. But they're not our rules. The rules of professional conduct, we have our own committee that interprets those. One last point, because we've gone way over. And I very much appreciate that. The place that I would suggest that the Court look is in Buckley v. Paleo at 20 – pages 28 to 29. And look at the Court's consideration of how these particular tiny bits of speech really work operationally in the campaign context. That's the constitutional analysis that permits intermediate scrutiny. Okay. Thank you. All right. I believe you had a minute and a half or so for rebuttal. Thank you, Your Honors. I just wanted to very quickly speak to what I'm sensing is a concern regarding the sufficiency of recusal as a remedy. And to do that, I would direct the Court to the Supreme Court's decision in Caperton v. A.T. Massey, Cole Company. It's cited in the briefing, but also I can give that to you now. Caperton is a pretty extreme case. I mean, a $3 million contribution, and there's a $50 million appeal pending. And lo and behold, Justice Benjamin wins, and he is the deciding vote in the 3-2 decision. U.S. Supreme Court says he should have recused. That's absolutely right. And what's interesting about that, though, is that the Supreme Court follows up on that in Citizens United discussing the Caperton decision and emphasizing that the holding in that decision was limited to a rule that the judge must be recused, not that the litigant's political speech could be banned. So even in the circumstance where a large contribution was issued — Umhurstley. Umhurstley. My understanding of that opinion is that the very facts that Judge Tolman has just cited were central to it, and that the opinion did not say that every lawyer who gives $150 to a judicial campaign candidate has to recuse himself. And that would be a pretty — I mean, if you had that rule, then nobody would ever raise any money. That's true. And I would contend then at least, at least then, a ban on speech ought to go no further than what a recusal requirement would require. Let me take you to another concrete example. In Cook County, Illinois, we had Operation Greylord, where a number of sitting And the bribes were as small as $200 to advance the scheduling of your case so that it would go to the head of the trial calendar. And, you know, 200 bucks may not seem like a lot, but in a high-volume court like the Circuit Court of Cook County, it adds up pretty fast. And some of these judges were supplementing their income quite nicely. Now, how under your broad First Amendment protection for speech can an enforcement officer from the Judicial Ethics Commission differentiate between a $200 contribution from a lawyer to the judge's campaign versus advancing the lawyer's business on the court's calendar? I mean, it seems to me it makes it almost impossible to enforce those kinds of Well, I think that, to me, is why recusal is a better solution than these broad sweeping bans, which would So the remedy here is don't worry. The circuit court judge in Cook County will recuse himself after he takes the $200 to advance the case. No. That's a fair point. I don't think that would have happened. No. And that is a fair point. But at least then, returning to my initial point then, then the ban ought to at least mirror what you would want to see with recusal. If recusal is insufficient in that circumstance, then make your ban address that. Don't just ban contributions or, in this case, personal solicitations across the board or endorsements across the board. Judge Easterbrooks and I think there were others, but his words in Bauer sort of resonated with me when he talked about the fact that it's going to be cold comfort to the party who appeared before a biased judge that he'll have to stand for reelection and will lose sometime down the road after the poor party has received injustice at the hands of the court. And that is fair. I think, I mean, I can understand where, you know, that judge is coming from and certainly where that litigant would be coming from. Certainly I think that's why we try to encourage transparency in the election process so we know who the contributors are, so that if we are a litigant and we see that our opponent, you know, made a sizable contribution, we can raise the point and ask the judge to recuse. And I will concede that there are circumstances that would be legitimately – would speak legitimately to that compelling interest such that you might restrict them beforehand to prevent them. But we're not looking at those types of rules here. Here we're looking at complete ban on personal solicitation, whatever it looks like, complete ban on endorsement for whomever. The other problem with recusal is that it's the judge. It's an individual thing. You know, I may think that I should recuse myself if I receive 50 bucks from somebody as a campaign contribution. On the other hand, you know, some other judges may say, well, you know, that's – you know, I'm only going to recuse myself if it was $1,000. Yeah. Well, I mean, just – I mean, recusal really, I mean, is an institutional matter. It doesn't really seem to address all the concerns that the State might have. Well, but I do think, you know, Justice Kennedy writing this Caperton decision, he does say that it's not – while he recognizes that an aspect of recusal certainly is a personal thing, he does offer that an objective standard can be applied. And he even – he even offers, you know, and again, I will quote from the decision starting at 883, quote, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented, end quote. And so there is a way to look at that. There certainly is, on appeal, a way to address that. You can certainly assert when you ask a judge to recuse, you can present them with this standard that has been offered by the Supreme Court to justify their recusal. So I think there are mechanisms in place. And I think, again, we are talking about, on the other side of the equation, a free speech interest. It's not purely just a recusal issue. Breyer.   Thank you, counsel. Does Judge Rousan have a question? No, that's all. Okay. All right. Thank you, counsel. We appreciate – we appreciate counsel's argument on this interesting case. It's submitted at this time.
judges: Paez, Berzon, Tallman